J. S33008/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| GARY BROWNDORF, | : | No. 2788 EDA 2012 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence, October 4, 2012,
in the Court of Common Pleas of Bucks County
Criminal Division at No. CP-09-CR-0000896-2012

BEFORE:  FORD ELLIOTT, P.J.E. DONOHUE AND LAZARUS, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED JULY 08, 2015**

Following a five-day jury trial, Gary Browndorf was convicted of perjury and simple assault.[1]  The charges arose from an incident in which appellant, then a sergeant with the Bucks County Sheriff's Department, punched a man whom he was assisting to arrest and then subsequently lied about the incident under oath.  Herein, he appeals the judgment of sentence entered on October 4, 2012; we affirm.

Appellant presents the following issues for our review:

> I.     DID THE TRIAL COURT ERR AND UNFAIRLY PREJUDICE APPELLANT WHEN THE COURT FORECLOSED APPELLANT FROM CROSS EXAMINING WITNESSES FOR THE COMMONWEALTH ABOUT THEIR MOTIVATIONS TO TESTIFY AND THEIR BIAS?

---

[1] Appellant was acquitted of two counts of official oppression, one count of false swearing, and two counts of unsworn falsification to authorities.

> II. DID THE TRIAL COURT ERR AND UNFAIRLY PREJUDICE APPELLANT WHEN THE COURT FORECLOSED CROSS EXAMINATION ABOUT AN OUT OF COURT STATEMENT THAT WAS NOT OFFERED FOR THE TRUTH OF THE MATTER ASSERTED?
>
> III. DID THE TRIAL COURT ERR AND UNFAIRLY PREJUDICE APPELLANT WHEN THE COURT RESPONDED TO THE JURY'S REQUEST FOR CLARIFICATION BY REREADING THE INSTRUCTION?
>
> IV. DID THE TRIAL COURT ERR AND UNFAIRLY PREJUDICE APPELLANT WHEN THE COURT REFUSED APPELLANT'S REQUEST TO GIVE JURY INSTRUCTION 3.14, WHICH REFERS TO CONSCIOUSNESS OF GUILT?[2]

Appellant's brief at 5.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, it is our determination that there is no merit to the questions raised on appeal. The trial court's opinion comprehensively discusses and properly disposes of each of the questions presented. Accordingly, we adopt that opinion as our own and affirm on that basis.

Judgment of sentence affirmed.

J. S33008/15

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/8/2015

---

[2] We note that appellant has abandoned his fourth issue and concedes that the trial court did not err. (Appellant's brief at 18.)

# IN THE COURT OF COMMON PLEAS
# BUCKS COUNTY, PENNSYLVANIA
# CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA    :    No. 0896 of 2012

       v.                    :

GARY BROWNDORF             :

## OPINION

Appellant Gary Browndorf ("Browndorf") was charged with one (1) count of Perjury, 18 Pa.C.S. § 4902; one (1) count of Simple Assault, 18 Pa.C.S. § 2701(a); two (2) counts of Official Oppression – Arrest Search Etc., 18 Pa.C.S. § 5301(1); one (1) count of False Swearing – Official Proceedings, 18 Pa.C.S. § 4903(a)(1); and two (2) counts of Unsworn Falsification to Authorities - Statements Under Penalty, 18 Pa.C.S. § 4904(b). These charges stemmed from an altercation that occurred on July 26, 2011, when Browndorf, acting in his capacity as a Deputy Sheriff of Bucks County, went to the residence of Philip Romanek ("Romanek") and Samantha Doneker ("Doneker") at 48 Garden Lane, Levittown, Bristol Township, Bucks County, Pennsylvania, with four other Deputy Sheriffs to execute an arrest warrant issued against Romanek for a violation of his probation.

On June 29, 2012, after a five-day jury trial, Browndorf was found guilty of Perjury and Simple Assault, and not guilty on the remaining charges of Official Oppression, False Swearing and Unsworn Falsification to Authorities.

On October 4, 2012, this Court sentenced Browndorf upon the count of Perjury to undergo imprisonment in the Bucks County Correctional Facility for not less than six (6) nor more than twelve (12) months, and upon the count of Simple Assault Browndorf was sentenced to a period of probation for two (2) years with the responsibility to complete two hundred (200) hours of community service and participate in an anger management course.

On October 5, 2012, Browndorf filed a Notice of Appeal to the Superior Court of Pennsylvania from the judgment of sentence entered on October 4, 2012.

On May 5, 2014, this Court ordered Browndorf to file a Concise Statement of the Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(b)(1), and on May 27, 2014, Browndorf filed a Concise Statement of the Matters Complained of on Appeal.

This Opinion is filed pursuant to Pa.R.A.P. 1925(a).

## FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, the following relevant evidence was presented at the jury trial conducted on June 25–29, 2012:

2

Detective John Knowles of the Bucks County District Attorney's Office testified that after receiving a telephone call on September 16, 2011 from Gail Cobb, a woman he had known for approximately 30 years in his capacity as a law enforcement officer, he subsequently conducted an interview of Cobb's daughter, Samantha Doneker, concerning allegations of assault and false arrest of Doneker and her fiancé, Philip Romanek, by Sheriff Browndorf at their residence at 48 Garden Lane, Levittown, Bucks County, Pennsylvania. N.T. June 26, 2012, pp. 48-51.

Philip Romanek testified that he had resided for about a year-and-a-half with his fiancé, Doneker, at her residence at 48 Garden Lane in Levittown, Bucks County. Romanek stated that he had been arrested in 2009 or 2010 for driving under the influence of alcohol and possession of marijuana and paraphernalia. He pled guilty and served a mandatory 72 hours of incarceration for a first DUI offense followed by 6 months of parole and a year of probation. As a result of missing two appointments with his probation officer and moving without permission, Romanek was found in violation of his parole and served 90 days in jail. Romanek was also ordered to attend a recovery house for his drug addiction, but a warrant was issued for his arrest when he left the recovery house in violation of his probation. N.T. June 26, 2012, pp. 60-63.

Romanek stated that he was aware that a warrant had been issued for his arrest because the sheriffs had previously left a notice at his residence. However, when the sheriffs again returned on July 26, 2011, he hid in the attic, explaining that "I was going to turn myself in two weeks later. I just had a few jobs lined up. I wanted to make money to support my family while I was locked up." N.T. June 26, 2012, pp. 63-65.

3

Romanek testified that after the sheriffs gained access to the residence, and he did not come down from the attic as ordered, Deputy Sheriff Boyle climbed up in the attic, ordered Romanek to get on his stomach and place his hands behind his back, and then handcuffed him. Romanek testified that he did not resist arrest. He related that Deputy Sheriff Klein, who was standing on a chair in the attic access and pointing his gun at him, told him, "Don't move a f'ing muscle, or I'll shoot you." After Romanek was helped to his knees by Deputy Boyle, he crawled to the access panel and sat on the edge with "my feet hanging down through the hole." He said that Deputy Boyle "stuck his arm through both of my arms and hoisted me down," and yelled to Deputy Klein, "Hey, Bill, are you ready to catch him?" N.T. June 26, 2012, pp. 70-74.

As Romanek was lowered down by Deputy Boyle, his weight was transferred to Deputy Klein standing on the chair, who then grabbed him by his legs. Romanek stated that as soon as his feet touched the chair, Browndorf "pushed Klein out of the way" and struck him in his chest with a closed fist. Romanek said he had not struggled, resisted or kicked anyone as he was lowered down, and asked Browndorf, "What was that for?" He said Browndorf pointed his finger at him and replied, "That's for kicking me." Romanek said his fiancé, Doneker, was in the hallway and screamed at Browndorf when she observed the altercation, and Browndorf "turned around and shoved her into the doorjamb and said, 'You're going to jail, too, for assault on a sheriff.'" N.T. June 26, 2012, pp. 74-80, 134, 168-169.

Romanek said they were taken to the Bristol Township Police station where he told the intake officer that they had been assaulted by Browndorf. Next, they were taken to District Justice Wagner's court where Romanek learned that they were being charged with aggravated assault and bail was set at one hundred thousand dollars ($100,000). They were then

4

transported to the Bucks County Correctional Facility ("BCCF"), where Romanek again complained about the assault. Romanek testified that photographs were taken of his apparent injuries and he was placed on lockdown for 72 hours "because they thought [his] spleen was ruptured," and x-rays were taken "a couple days later." Romanek said his chest hurt for approximately two weeks after the incident, but he has no lasting injury from the incident. N.T. June 26, 2012, pp. 80-82, 90-92, 137-140.

Romanek testified that his preliminary hearing was held on August 23, 2011, at which time the aggravated assault charge filed by Browndorf was dismissed by Judge Wagner. Romanek stated that he remained incarcerated until October 7, 2011, for his parole violation, and that the charges filed by Browndorf against him and Doneker were subsequently dismissed by the Bucks County District Attorney's Office. Romanek said he was not testifying under any grant of immunity and there had been no negotiations with the District Attorney's Office concerning his sentence for his parole violation. N.T. June 26, 2012, pp. 83-86.

Romanek admitted that he had discussed with Doneker, during the approximately 200 telephone calls he made from BCCF to her, the possibility of pleading guilty to simple assault, and acknowledged making the following statements to her during those telephone conversations:

> Make sure you do everything I tell you to do in this letter. I'm telling you, this dude I talked to that I know from outside, he's a very smart dude. He's street-smart, should I say? But the dude's got so many settlements himself. He's a very smart person. What do you call him? He's a jail-educated person, if you want to say that. And if you do what I tell you in this letter, he said, you'll have no problems getting 650,000 to a mil. Might as well make a bad situation go right.

and

> Yo, this is what is going to happen. I've been talking to some people. And what is going to happen is that we are going to probably wind up going to court. They are going to lower the court to simple assault ... because the officer never lost any

5

work. So it's going to be just simple assault. You will get ARD. My PO will recommend anywhere from 12 to 15 months, and I'm maxing out. I'm probably going to go upstate.

Romanek explained that he felt that he was "a civilian going up against law enforcement, [and] I just thought I had no chance." Romanek acknowledged discussing the possibility of hiring an attorney to sue Browndorf, but said that was done out of anger and they never did hire an attorney. N.T. June 26, 2012, pp. 87-88, 141-153, 159-167.

Romanek acknowledged that he had previously plead guilty to DUI: controlled substance or metabolite; DUI: controlled substance – impaired ability; Marijuana – small amount, personal use; Use or possession of drug paraphernalia; Accident, damage to unattended vehicle or property; and Careless driving. N.T. June 26, 2012, pp. 93-98.

Samantha Doneker testified that she has lived at 48 Garden Lane for approximately fourteen years. She recounted that on July 26, 2011, she, Romanek, her son, Richard Matonti, and her daughter, Sarah Matonti, were present at her residence when the sheriffs arrived around 11:30, "banging on the doors and windows." She said Romanek proceeded to hide in the attic and she went and opened the front door. Doneker said she lied to the sheriffs when they asked if Romanek was present because she "didn't want him to go to jail" since he had several fencing jobs "to get done before he would actually turn himself in." As a result, she was charged with hindering apprehension, to which she plead guilty, and is currently in the ARD program for first-time offenders. N.T. June 26, 2012, pp. 177-184.

Doneker testified that it was "chaos" as the sheriffs searched the entire house for Romanek. She said she was eventually permitted "to go to the bathroom to put a bra on," after which she opened the bathroom door and saw Browndorf, who was in front of her, go into the closet and strike Romanek as he was lowered down from the attic to Deputy Klein. Doneker

said she saw Browndorf's arm move two or three times, and stated that one of those movements was a strike. She said she stated, "Yo, yo, yo, what the fuck are you doing? And what is your name?" to Browndorf who, although she had had no physical contact with him, then "turned around, grabbed me by my arms, pushed me into the bathroom [door], pulled me into him, and said, "Now you're under arrest for assaulting a sheriff." Browndorf handcuffed her and took her outside and placed her in a police vehicle and she was taken to the Bristol Township Police station where she was fingerprinted and photographed for the first time. Doneker was then taken to Judge Wagner's chambers where bail was set at one hundred thousand dollars, and because she was unable to post bail, she subsequently spent four days in BCCF. Doneker said she was charged with "aggravated assault, simple assault and hindering ... or harboring concealing," and she acknowledged pleading guilty to the hindering charge. N.T. June 26, 2012, pp. 184-196.

Doneker was eventually released from prison after her bail was reduced. Her preliminary hearing was held on August 23, 2011, at which only Browndorf appeared and testified against her, and the charge of aggravated assault filed against her was dismissed. She stated that the charge of simple assault was also eventually dismissed and that no bargains or negotiations had occurred with the District Attorney's Office. She denied discussing the possibility of getting a civil attorney for a lawsuit during her telephone conversations with Romanek or "hatching a plan to frame [Browndorf]." N.T. June 26, 2012, pp. 196-201, 248.

Deputy Daniel Boyle of the Bucks County Sheriff's Office testified that he arrived at 48 Garden Lane on July 26, 2011, with four other sheriffs to serve a criminal warrant on Romanek. According to Deputy Boyle, after the sheriffs banged on doors and windows, Doneker answered the front door and denied that Romanek was present. The sheriffs then

7

gained access to the house and during their search they heard a noise in the attic. After locating the access to the attic, Deputy Boyle climbed up into the attic with a flashlight and his weapon drawn and observed Romanek behind the chimney. Romanek complied with Deputy Boyle's order to drop what was in his hands, which happened to be a flashlight, and come out and lie face down on the plywood with his hands behind his back. Deputy Boyle then handcuffed Romanek and assisted him to the access hole. After twice denying Romanek's request to remove the handcuffs, Deputy Boyle instructed Romanek to sit on the edge of the access hole, and then hooked his arm through Romanek's arms and lowered him down to Deputy Klein. He said Romanek did not struggle and he felt the transfer of Romanek's weight onto either the chair or Deputy Klein as he lowered him down, but due to his position in the attic, he did not see what occurred below between Romanek and Browndorf. N.T. June 27, 2012, pp. 254-271, 276-277.

Deputy Boyle remained in the attic for a few minutes after Romanek had been lowered down to search for a missing magazine for his firearm. He then exited the attic, injuring his arm in the process. Deputy Boyle stated that discussions ensued among the sheriffs about charging Romanek and Doneker, and he subsequently assisted in filing criminal complaints against them at the Bristol Township Police Station at the direction of Browndorf, who was the acting supervisor on that day. N.T. June 27, 2012, pp. 271-275.

William Klein testified that he had been employed by the Bucks County Sheriff's Office beginning in June of 2006, but was dismissed after the events that occurred on July 26, 2011, and was currently unemployed. Klein testified that he had gone to 48 Garden Lane in Levittown, Bucks County on that day with his partner, Deputy James McAndrew, and Corporal

8

Dave Prudish, Deputy Dan Boyle and Sergeant Gary Browndorf, to serve a warrant. N.T. June 27, 2012, pp. 305-307.

After arriving at the residence around noontime, the sheriffs eventually gained access to the house and heard "creaking coming from the ceiling." They located the access hatch to the ceiling and observed that someone had recently gone up into the attic. Klein assisted Deputy Boyle in climbing up into the attic, and asked Corporal Prudish to go outside and cover the attic vent. Klein then partially entered the attic by standing on a chair to cover Deputy Boyle, who subsequently handcuffed Romanek and lowered him down to Klein. Klein stated that he stepped down from the chair to allow Deputy Boyle to lower Romanek down to him. He said the closet was very small and "Deputy McAndrew was somewhere to my left and Sergeant Browndorf was to my right" and behind him. N.T. June 27, 2012, pp. 307-312.

Klein testified that he grabbed Romanek by "the waist of his shorts" as he was lowered down, and said Romanek did not kick him or make any swinging motions with his legs, nor did he feel him kick McAndrew or Browndorf. Klein stated, however, that as Romanek "was being lowered from the attic, he was struck by Sergeant Browndorf. Mr. Romanek asked why he was struck. Gary Browndorf stated that he was kicked. And the girlfriend, Miss Doneker, became irate." Klein said Browndorf struck Romanek in his mid-section "from behind me and to the right." Klein was not able to observe any interaction that occurred between Browndorf and Doneker. N.T. June 27, 2012, pp. 313-317.

James McAndrew testified that he had been employed by the Bucks County Sheriff's Office for approximately eleven (11) years, but was dismissed after the events that occurred on July 26, 2011, and was currently unemployed. McAndrew testified that he had gone to 48 Garden Lane in Levittown, Bucks County on that day with the four other sheriffs as part of a

9

warrant squad to serve a warrant on Romanek after they received a tip that he would be there. McAndrew related that they initially went to the address specified in the warrant where they encountered Romanek's father, who then directed them to Doneker's residence across the street. McAndrew stated that after the sheriffs gained entry into Doneker's house, Doneker lied to him by stating that Romanek was not present and that "she kicked him out months ago." The sheriffs, however, heard a noise in the attic space and Deputy Boyle climbed up into the attic through the access hole in the closet and then Klein climbed part way up. McAndrew was to the left of Klein and Browndorf was behind McAndrew. As Deputy Boyle lowered down Romanek, who was handcuffed, McAndrew observed Browndorf from his peripheral vision punch Romanek in the chest. McAndrew testified that he did not see Romanek kick Browndorf, and he did not see Doneker punch, kick or jump on Browndorf, but stated he did see her "push" him. N.T. June 27, 2012, pp. 334-355, 371-372.

David Prudish testified that he had been employed by the Bucks County Sheriff's Office for thirteen and half years but was dismissed as a result of the incident at 48 Garden Lane on July 26, 2011, and was currently unemployed. Prudish had been part of the warrant team that went to Doneker's residence to arrest Romanek. After the sheriffs gained access to the house and searched the first floor, it was believed that Romanek was in the attic, so Prudish went outside to insure he did not escape. Prudish therefore did not see any contact between Browndorf and Romanek or Doneker. Prudish testified that he nevertheless wrote an incident report at the Bristol Township Police station based upon information provided by Browndorf. The information included statements that "while the subject was coming down from the attic, he kicked Sergeant Browndorf in the chest area, striking the vest," and "Sergeant Browndorf backed away. Miss Doneker, who had located herself behind Sergeant Browndorf, started to

10

punch and push the sergeant." Prudish testified that he had transported Doneker to the Bristol Township Police station and that during the trip she had been crying and stated that "Sergeant Browndorf had punched Romanek and pushed her to the floor." Prudish said he did not tell the investigating grand jury that he wrote an incident report because he "forgot." N.T. June 27, 2012, pp. 389-414.

A.J. Garabedian testified that he is an Assistant District Attorney with the Bucks County District Attorney's Office, and that on August 23, 2011, the date of the preliminary hearing for the charges filed against Romanek and Doneker, he had been requested to assist Browndorf at the District Court. Although there is an established protocol for law enforcement officers to request assistance from the District Attorney's Office prior to a hearing, it was not followed in this case, and Garabedian was asked to assist Browndorf upon his arrival at the court. N.T. June 27, 2012, pp. 420-423.

After he obtained a copy of the Criminal Complaint at the hearing, because Browndorf "didn't have anything with him," Garabedian noted that Romanek was charged with aggravated assault, a felony of the first degree; simple assault, a misdemeanor of the second degree; and summary harassment, a summary. In addition, it appeared that Romanek had also been charged with theft by unlawful taking. Garabedian then had to amend the Complaint to reflect the proper subsection for aggravated assault, (a)(3), causing bodily injury to a law enforcement officer, a felony of the second degree. Garabedian further noted that Doneker had been charged with hindering apprehension, a misdemeanor of the second degree; aggravated assault, a felony of the first degree; and simple assault, a misdemeanor of the second degree. Garabedian stated that after Browndorf testified under oath, "certain charges were held for

11

court. Judge Wagner dismissed the aggravated assault charge." N.T. June 27, 2012, pp. 423-426.

Garabedian then recited Browndorf's testimony from the transcript of the preliminary hearing in which Browndorf testified under oath that he had been punched in his vest "maybe once or twice" by Doneker and kicked "just once" by Romanek, and that "it was like a swinging motion as he came down." Garabedian related that Browndorf testified that Deputy Boyle and Klein both went up into the attic, and that as Romanek "was coming down, he kicked me in the ... chest area, and I fell back where ... Miss Doneker was behind me, who again started punching and yelling at me and pushing me. I was actually in between the two of them." Browndorf further testified at the preliminary hearing that Romanek "cursed me up and down" when he kicked him, that he had been in or near the closet and could see Romanek's face as he was coming down, that he was standing "with my hands up, ready to catch [Romanek] in case he fell," and that he was "focused on [Romanek's] torso up, reaching up for his legs, and that's when I got hit." When he was asked if Romanek "kicked him hard enough to force you to go backwards," Browndorf had replied, "Absolutely, yes," and reasserted that he was pushed and then hit in his back by Doneker. N.T. June 27, 2012, pp. 427-445.

Browndorf then testified on his own behalf, stating that he had been formerly employed as a sergeant in the Bucks County Sheriff's Office for six or seven years, prior to which he had served as a Philadelphia police officer for twenty four years. Browndorf stated that he had Bachelor's and Master's degrees from Temple University in secondary education and was enrolled in a Master's program for psychology at Holy Family University. N.T. June 27, 2012, pp. 457-473.

12

On July 26, 2011, Browndorf testified that he was in charge of the warrant unit and "overheard on the radio that there was someone in the attic, and they were having a problem getting him down." Since he was "in the area" at the time, he "went over to the scene." According to Browndorf, after the sheriffs entered the residence and heard noises in the attic, he asked Doneker's son, Rich, to ask Romanek to come down. When Romanek failed to respond, Browndorf approved the selection of Deputy Boyle to go up in the attic to retrieve Romanek. Romanek was then brought to edge of the attic access hole, and as he was lowered down, Browndorf said the sheriffs "all moved closer because ... we wanted no one to get hurt in this situation." According to Browndorf, he did not know if Romanek was handcuffed at that time. He said he never touched Romanek, but as he was lowered Romanek kicked him in his chest, and "it surprised me, so I went back a little, and then I went forward to grab him." He said he never at any time intentionally punched Romanek. N.T. June 27, 2012, pp. 474-485.

Browndorf said that Doneker had asked to go to the bathroom to put on her bra, and when she came out, she was behind him and started to yell. He said he "felt what I felt was a punch, a push. ... I knew I was being touched and assaulted," so "when I realized that Romanek was handcuffed, I turned around and handcuffed her." Browndorf then requested Corporal Prudish, his second in command, to prepare a report of the incident in response to a request from his supervisor, and Browndorf insisted that he did not intentionally fabricate either encounter with Romanek or Doneker. Browndorf denied that he had testified at the preliminary hearing that Klein had climbed up into the attic with Deputy Boyle. He further insisted that, notwithstanding the size of the small "three foot" closet, he, Klein and McAndrew were all in the "vicinity" of the closet as Romanek was lowered down, and that Romanek, whose feet "were moving back and forth," had kicked him in his vest. Browndorf insisted that he had not

13

struck Romanek, but instead only "grabbed" him, and he acknowledged that "the situation became chaotic" after that occurred. N.T. June 27, 2012, pp. 486-511, 521-522.

Browndorf testified that although he was the affiant, he did not write his own incident report, and he had Deputy Boyle file the Criminal Complaints on his behalf against Romanek and Doneker, because he was unfamiliar with the process and he "was learning how to do the charging through watching Boyle." N.T. June 27, 2012, pp. 514-519.

Prior to closing arguments, this Court granted the Commonwealth's motion to amend the Criminal Information to change the actual date of Count 1, Perjury, and Count 5, False Swearing, to August 23, 2011, the date of the preliminary hearing. N.T. June 28, 2012, p. 528.

On June 29, 2012, at the conclusion of the trial, the jury returned with verdicts of guilty on Count 1, Perjury and Count 2, Simple Assault, and not guilty as to Counts 3 and 4, Official Oppression; Count 5, False Swearing; and Counts 6 and 7, False Statement Under Penalty. N.T. June 29, 2012, pp. 663-668.

On October 4, 2012, after denying Browndorf's motion to dismiss the charges based upon weight of the evidence and sufficiency of the evidence grounds, this Court sentenced Browndorf to undergo imprisonment in the Bucks County Correctional Facility for not less than six (6) nor more than twelve (12) months upon the count of Perjury, and sentenced him to a period of probation for two (2) years with the responsibility to complete two hundred (200) hours of community service and participate in an anger management course upon the count of Simple Assault. N.T. October 4, 2012, pp. 2-3, 62-68.

In his Concise Statement of Matters Complained of on Appeal, Browndorf raises the following issues on appeal verbatim:

14

1. The Court erred when it refused Defendant's request to give Instruction 3.14, which refers to consciousness of guilt.

2. The Court erred when it foreclosed Defendant's ability to cross-examine Philip Romanek about the motivations for his testimony and the witness' bias.

3. The Court erred when it foreclosed examination, regarding witnesses' contemplation of litigation and the witness' bias against Defendant.

4. The Court erred when it foreclosed cross-examination of James P. McAndrew, Jr., about a conversation with Philip Romanek's father. The testimony was not sought to be offered for the truth of the matter. Rather, the testimony sought to establish a course of conduct.

5. The Court erred when it foreclosed Defendant's ability to cross-examine David Prudish about the witness' bias and motives to testify.

6. The Court erred when it responded to a juror's question, which requested clarification of the charges – a "yes or "no" answer. Instead of offering clarification, His Honor reread the instruction.

Statement of Matters Complained of on Appeal, May 27, 2014.

## DISCUSSION

In his initial complaint, Browndorf argues that it was error for this Court to deny his request to provide the jury with Criminal Jury Instruction 3.14, Flight or Concealment as Showing Consciousness of Guilt, as applied to the victim, Romanek, rather than the defendant, Browndorf.

It is well-established that:

[t]he nature of a court's instructions to the jury is "within the discretion of the court, so long as the court accurately instructs the jury on the appropriate legal principles involved." *Commonwealth v. Kim*, 888 A.2d 847, 852 (Pa.Super. 2005) (quoting *Commonwealth v. Harley*, 424 Pa.Super. 29, 621 A.2d 1023, 1028 (1993)). This Court's main concern is "that the charge clearly, adequately, and accurately presents the law to the jury for its consideration." *Id.* (quoting *Commonwealth v. Collins*, 810 A.2d 698, 701 (Pa.Super. 2002)). The jury charge must be reviewed "not in isolated portions but as a whole to ascertain whether it fairly conveys the required legal principles at issue." *Commonwealth v. McClendon*, 874 A.2d 1223, 1232 (Pa.Super. 2005).

15

*Commonwealth v. Willis*, 990 A.2d 773, 776 (Pa.Super. 2010).

The Superior Court of Pennsylvania has also observed

... that "[t]he relevant inquiry for this Court when reviewing a trial court's failure to give a jury instruction is whether such charge was warranted by the evidence in the case." *Commonwealth v. Boyle*, 733 A.2d 633, 639 (Pa.Super. 1999) *(citing Commonwealth v. Mays*, 450 Pa.Super. 188, 675 A.2d 724, 729, *appeal denied*, 546 Pa. 677, 686 A.2d 1309 (1996)); *See also Commonwealth v. Spotz*, 552 Pa. 499, 517, 716 A.2d 580, 589 (1998) *(citing Commonwealth v. Browdie*, 543 Pa. 337, 671 A.2d 668, 673 (1996)) (Explaining that a particular jury instruction is only warranted when there is evidence to support such an instruction).

\*\*\*

... Additionally, the Pennsylvania Superior Court has explained that:

"[I]n reviewing a challenge to the trial court's refusal to give a specific jury instruction, it is the function of this [C]ourt to determine whether the record supports the trial court's decision." In examining the propriety of the instructions a trial court presents to a jury, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal.

*Commonwealth v. Brown*, 911 A.2d 576, 582–583 (Pa.Super. 2006) (citing *Commonwealth v. Thomas*, 904 A.2d 964, 970 (Pa.Super. 2006)). In the instant case, the record clearly supports the jury instruction given.

*Commonwealth v. Baker*, 963 A.2d 495, 506-507 (Pa.Super. 2008).

In the instant matter, Browndorf is apparently arguing that this Court impermissibly prevented him from insinuating or suggesting to the jury, through Criminal Jury Instruction 3.14, that Romanek was indeed guilty of assaulting Browndorf because he had stated in a telephone conversation with Doncker, recorded while he was incarcerated, that he had

16

contemplated pleading guilty to simple assault upon Browndorf and would receive a resultant sentence of 12 to 15 months incarceration. This would support Browndorf's allegation that he was kicked by Romanek and therefore bolster his credibility with, and engender sympathy from, the jury. We determined, however, that Jury Instruction 3.14 was inappropriate in this instance for several reasons, and accordingly denied Browndorf's request. *See* N.T. June 28, 2012, pp. 617-618.

Initially, we noted that Browndorf's argument is premised upon the assumption that Romanek's statements made during the telephone conversations with Doneker constituted an actual admission that he was guilty of assaulting Browndorf. This, however, was never established, and in fact was contradicted by the evidence and testimony of all of the witnesses except for Browndorf. Consequently, we concluded that Browndorf's request was an inappropriate attempt to invade the province of the jury by improperly influencing their recollection and interpretation of the evidence.

More significantly, we observed that Criminal Jury Instruction 3.14, Flight or Concealment as Showing Consciousness of Guilt, provides as follows:

3.14 (Crim)        CONSCIOUSNESS OF GUILT, FLIGHT, OR
                   CONCEALMENT AS SHOWING

1.     There was evidence, including the testimony of *[name of witness]*, that tended to show that the defendant [fled from the police] [hid from the police] *[give specifics]*. [The defendant maintains that [he] [she] did so because *[reason]*.] The credibility, weight, and effect of this evidence is for you to decide.

Generally speaking, when a crime has been committed and a person thinks he or she is or may be accused of committing it and he or she flees or conceals himself or herself, such flight or concealment is a circumstance tending to prove the person is conscious of guilt. Such flight or concealment does not necessarily show consciousness of guilt in every case. A person may flee or hide for some other motive and may do so even though innocent. Whether the evidence of flight or concealment in this case should be looked at as tending to prove guilt depends

17

upon the facts and circumstances of this case and especially upon motives that may have prompted the flight or concealment.

2. You may not find the defendant guilty solely on the basis of evidence of flight or concealment.

Criminal Jury Instruction 3.14.

The plain language of this jury instruction specifically refers and applies to the defendant in the case, and the clear intent of the instruction is to focus the jury's attention upon the conduct and culpability of the defendant and the charges that the defendant faces. This instruction does not apply to the victim, and it is not designed to assist, instruct, or suggest to the jury on how to evaluate or consider the victim's conduct. Therefore, in recognition of the well-established principle that "[t]he primary duty of a trial judge in instructing a jury is to clarify the issues so the jury is able to comprehend the question they are to decide," *Chicchi v. Southeastern Pennsylvania Transp. Authority*, 727 A.2d 604, 609 (Pa.Cmwlth. 1999), we concluded that Browndorf's request was an improper attempt to deflect the jurors' attention away from the defendant's conduct by distracting them with inappropriate considerations of the victim's unsympathetic behavior.

Furthermore, Jury Instruction 3.14 is concerned with "evidence of flight or concealment." While it was uncontested that Romanek was seeking to hide from the sheriffs when they arrived at his residence, and Romanek has readily admitted that he did so, the conduct of Romanek, the victim, is not at issue, and Browndorf's argument in this instance is principally concerned with prior statements made by Romanek that would implicate his guilt, and not his conduct in fleeing or concealing himself. *See* N.T. June 28, 2012, p. 617, ("there's a consciousness of guilt because he saying that ... it's false charges. This guy wants to plead guilty to what he says are false charges.") We therefore concluded that providing Jury

18

Instruction 3.14, as requested by Browndorf, could potentially confuse or mislead the jurors, and declined the opportunity to do so.

Browndorf's next four issues complained of on appeal essentially allege that this Court "foreclosed Defendant's ability to cross-examine" various witnesses about their motivations for their testimony and their bias against him. In particular, Browndorf suggests that he was unable to cross-examine Romanek and Doneker about their expressed desire to initiate litigation against Browndorf for personal financial gain, or to cross-examine Prudish and McAndrew about their motivations to testify, or to inquire about McAndrew's "conversation with Philip Romanek's father." According to Browndorf, that "testimony was not sought to be offered for the truth of the matter," but rather "to establish a course of conduct."

The Superior Court of Pennsylvania has observed that:

> [w]ith respect to the admission of evidence, the trial court has broad discretion and will not be reversed absent an abuse of that discretion. *Commonwealth v. Stark*, 363 Pa.Super. 356, 526 A.2d 383, 391 (1987), *appeal denied*, 517 Pa. 622, 538 A.2d 876 (1988). The trial court should not admit evidence that has no relevance to a case. Relevant evidence is that which tends to establish facts in issue or in some degree advances the inquiry and is therefore probative. However, even relevant evidence may be excluded where the trial judge, in his or her discretion, finds that admission may confuse, mislead or prejudice the jury. *Id.* The probative value of a piece of evidence cannot be outweighed by its prejudicial impact.

*Commonwealth v. Impellizzeri*, 661 A.2d 422, 428 (Pa.Super. 1995).

In the instant matter, Browndorf's allegation that he was prevented from cross-examining Romanek and Doneker about their intent to pursue litigation against him is refuted by the record which reflects that he was permitted to question them about this possibility. As noted above, Browndorf's defense counsel was permitted to read into the record Romanek's statements he made during the telephone conversation he had with Doneker that was recorded while Romanek was incarcerated at BCCF on August 17, 2011, and which Romanek

19

acknowledged making, in which he stated that "if you do what I tell you in this letter, he said, you'll have no problems getting 650,000 to a mil. Might as well make a bad situation go right." *See* N.T. June 26, 2012, p. 153.

The record reflects that Browndorf's defense counsel also cross-examined Doneker about that potential ligation:

Q:    And, by the way, you have not contacted a lawyer to file a suit at the present time. Is that correct?

A:    Correct.

Q:    You did consult with an attorney about filing a suit. Correct?

A:    No, not correct.
Q:    You're aware that you still have two years from the date that this incident to file suit?

A:    I don't know the laws about —

The Commonwealth:  Objection, Judge.

The Court:    Objection sustained. Outside the scope.

N.T. June 26, 2012, pp. 248-249.

From these excerpts, it is clear that Browndorf was permitted to present evidence to the jury of Romanek's and Doneker's contemplated litigation, revealing to the jury a possible motivation for their testimony, which would have a direct bearing on their credibility. However, this Court did not permit Browndorf's counsel to pursue cross-examination of the witnesses concerning the specifics of that litigation because it was not relevant or probative of the charges Browndorf faced, and was in our view designed instead to inflame and mislead the jury.

Browndorf also alleges that he was improperly prohibited from cross-examining Prudish and McAndrew about their motivations to testify. Without specifically stating so,

20

Browndorf is presumably referring to the Commonwealth's Motion *In limine* to prohibit the introduction of any evidence relating to his allegation that his prosecution in this matter was politically motivated, which this Court granted at the start of his trial on June 25, 2012. *See* N.T. June 25, 2012, pp. 6-10.

The Commonwealth's Motion *in limine* was filed as a result of Browndorf's Motion to Disqualify the Office of the District Attorney, filed on October 25, 2011. In his Motion to Disqualify, Browndorf alleged that he had been subpoenaed to testify before the County Investigating Grand Jury on September 29, 2011. According to Browndorf's Motion, the inquiry of the investigation concerned "various government agencies," and "may include allegations of impropriety on the part of the Bucks County District Attorney's Office and other government agencies." Browndorf alleged that because he had "worked for a numerous years in law enforcement in Bucks County [and] appear[ed] before and work[ed] with virtually every District Attorney in Bucks County," there "would be a conflict of interest that would render it unlikely that [he] would receive a fair trial." Motion to Disqualify the Office of the District Attorney of Bucks County, October 25, 2011. Although an Order was entered on October 26, 2011, granting a temporary stay of the Preliminary Hearing scheduled for October 27, 2011, this Court denied Browndorf's Motion after a hearing on January 27, 2012.

On April 2, 2012, the Commonwealth filed its Motion *in limine* asserting that Browndorf's allegation that his prosecution was politically motivated and vindictively pursued by the District Attorney's Office was not supported by "one shred of evidence." The Commonwealth argued that Browndorf's claims were baseless, false and "completely irrelevant to the factual determination of the case," and it therefore requested that any

21

questioning of the jurors during *voire dire* and any argument by defense counsel that was related to these claims be precluded. Commonwealth's Motion *In Limine*, April 2, 2012.

As noted above, despite defense counsel's suggestion that Browndorf "talked about some inappropriate conduct on the part of officials here in Bucks County" during his appearance before the Grand Jury "and lo and behold ... all of a sudden he is arrested on this matter," *see* N.T. June 25, 2012, pp. 7-8, this Court determined that Browndorf's allegations were not relevant to the charges under consideration and granted the Commonwealth's Motion *In limine* at the start of the trial. We specifically noted as follows:

> The Court is going to agree from the circumstances presented here with the Commonwealth's position that it serves no worthwhile purpose in allowing us to go into the trier of facts' consideration as to whether or not there was or was not any political motivation for the bringing of these particular charges in light of also the fact that I think it's most appropriate that that information not be brought forth during the trial.

N.T. June 25, 2012, pp. 9-10.

We concluded that any questions or argument that might be presented at Browndorf's trial suggesting that his prosecution in this case was politically motivated would not be probative of his guilt or innocence of the charges he faced at trial, and that such a strategy was only designed to improperly mislead and inflame the passions of the jurors. Since we concluded that evidence suggesting that Browndorf's prosecution was politically motivated would not be relevant or probative of whether or not he was guilty of actually striking a handcuffed Romanek, we find no merit to Browndorf's allegation that he was impermissibly restricted in cross-examining the various witnesses concerning this subject.

Browndorf next complains that he was improperly prevented from cross-examining McAndrew about a "conversation with Philip Romanek's father." In seeking to establish that the prohibited cross-examination and the witness' expected response would not involve

22

impermissible hearsay, Browndorf argues that the "testimony was not sought to be offered for the truth of the matter," but rather "to establish a course of conduct," which he apparently suggests is in this instance an exception to the Rule Against Hearsay. *See* Pa.R.E. Rule 802.

Browndorf presumably refers to the following exchange that occurred during his cross-examination of McAndrew:

Q: And did you go to that address that was on the warrant?

A: Yes.

Q: And when you went to that address that was on the warrant, did you come into contact with any individual?

A: Phil Romanek's father.

Q: Did you have a conversation with him?

A: Yes, I did.

Q: And did you question him about where his son was?

A: Yes.

Q: And what was his response?

[The Commonwealth]: Objection. Hearsay.

The Court: Objection is sustained.

[Defense Counsel]: Your Honor, this is a course of conduct now as to how he gets from one spot to another.

[The Commonwealth]: Course of conduct is not an exception to the hearsay rule, Your Honor.

The Court: Objection is sustained.

[Defense Counsel]: Excuse me, Your Honor. There is an exception to the hearsay rule –

The Court: There are a lot of exceptions. I've already ruled. Let's proceed.

23

N.T. June 27, 2012, pp. 354-355.

The Supreme Court of Pennsylvania has established that:

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c). Thus, any "out of court statement offered not for its truth but to explain the witness's course of conduct is not hearsay." *Commonwealth v. Rega*, 593 Pa. 659, 933 A.2d 997, 1017 (2007) (citing *Commonwealth v. Sneed*, 514 Pa. 597, 526 A.2d 749, 754 (1987) [(holding that where a police officer related the contents of a radio call that prompted his trip to the crime scene, such testimony was not hearsay because it was introduced solely to explain how the officer came to be at the scene)].

*Commonwealth v. Johnson*, 42 A.3d 1017, 1035 (Pa. 2012).

A review of *Johnson, Rega* and *Sneed*, supra, reveals that each of those cases involved the testimony of police officers concerning statements that were related to them by a third party upon which the officers based their subsequent course of conduct in either pursuing further investigation, collecting evidence or apprehending the defendant. In each case, the courts ruled that the statements were not hearsay because they had not been offered for the truth of the matter asserted in them, but had instead been properly admitted for the purpose of explaining the subsequent course of conduct of the police officers.

That is clearly not analogous to the factual scenario under consideration in the case *sub judice*. While McAndrew testified that the sheriffs proceeded to Doneker's residence after speaking to and receiving information from Romanek's father, any subsequent statements made by Romanek's father to the sheriffs concerning Romanek would not be relevant to or probative of the charges that were eventually filed against the defendant in this case, Browndorf. Romanek, as noted, is not the defendant in this case and his "course of conduct" is not at issue, nor is McAndrew's course of conduct under scrutiny. The limited testimony regarding the sheriffs' encounter with Romanek's father was sufficient to explain to the jury

24

why the sheriffs proceeded to Doneker's residence, and it is obvious that any further cross-examination concerning additional statements made by Romanek's father would not be relevant to Browndorf's conduct, and would only serve as an attempt to improperly influence or mislead the jurors.

We are also cognizant that the Superior Court in *Commonwealth v. Dent*, 837 A.2d 571 (Pa.Super. 2003), offered the following cautionary discussion regarding the application of the "course of conduct" exception to the Rule Against Hearsay:

> [I]n *Commonwealth v. Palsa*, 521 Pa. 113, 555 A.2d 808 (1989), our Supreme Court recently reviewed a similar challenge to testimony which the prosecution claimed was justifiably introduced to explain police conduct. There, the Supreme Court observed,
>
>> It is, of course, well established that certain out-of-court statements offered to explain a course of police conduct are admissible. Such statements do not constitute hearsay since they are not offered for the truth of the matters asserted; rather, they are offered merely to show the information upon which police acted. *Commonwealth v. Sneed*, 514 Pa. 597, 606–07, 526 A.2d 749, 754 (1987); *Cruz*, [ *supra* ] (police responded to radio call reporting a disturbance); *Commonwealth v. Sampson*, 454 Pa. 215, 219, 311 A.2d 624, 626 (1973) (police declined to arrest an individual who asserted his innocence); *Commonwealth v. Tselepis*, [198 Pa.Super. 449] 181 A.2d 710, 712 (Pa.Super.1962) (police acted upon informant's tip that defendant was conducting a lottery). *See also* [ *Underwood, supra* ] ("This Court has repeatedly upheld the introduction of out-of-court statements for the purpose of showing that based on information contained in the statements, the police followed a certain course of conduct that led to the defendant's arrest.").
>>
>> Nevertheless, it cannot be said that every out-of-court statement having bearing upon subsequent police conduct is to be admitted, for there is great risk that, despite cautionary jury instructions, certain types of statements will be considered by the jury as substantive evidence of guilt. Further, the police conduct rule does not open the door to unbounded admission of testimony, for such would nullify an accused's right to cross-examine and confront the witnesses against him.
>
> *Palsa, supra*, at 118, 555 A.2d at 811, 812 (footnotes omitted). The *Palsa* court, after noting that the challenged statements were likely to be understood by the

25

jury as themselves proving the elements of the crime for which the defendant was charged, concluded,

> In this case, the police easily could have explained the course of their conduct pertaining to the investigation and arrest of appellant...without resorting to the full and explicit statements given by [the informant]. It is the prosecutor's duty to avoid the introduction of out-of-court statements that go beyond what is reasonably necessary to explain police conduct....
>
> The statements could have been attenuated in other ways, too, to lessen their prejudicial impact.
>
> Thus, an adequate explanation for police conduct could have been provided, while minimizing the introduction of statements made by a person who was not under oath and who was not available for cross-examination.

*Palsa, supra,* at 118, 555 A.2d at 811 (emphasis deleted).

***

... As our Supreme Court explained:

> In criminal cases, an arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct. His testimony that he acted "upon information received," or words to that effect, should be sufficient. Nevertheless, cases abound in which the officer is allowed to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the ground that he was entitled to give the information upon which he acted. The need for the evidence is slight, the likelihood of misuse great.

*Palsa, supra* at 118, 555 A.2d at 810-11 (emphasis added).

*Dent,* 837 A.2d at 579 -580.

In accordance with the preceding discussion and cautionary instructions, this Court properly prohibited Browndorf's defense counsel from pursuing further cross-examination of McAndrew concerning any additional statements made by Romanek's father. It is clear that the information elicited from such testimony would not comply with the tenets enunciated in the case law cited above and could not therefore be considered a "course of conduct" exception to the prohibition of inadmissible hearsay. Browndorf's complaint in this instance has no merit.

26

Browndorf lastly alleges that this Court erred when, in response to the jury's question requesting clarification of the instructions for a particular charge which he alleges required a "yes or "no" answer, we instead reread the instruction to the jury.

In addressing the specific jury request for clarification to which Browndorf is apparently referring, the record reveals the following exchange occurred after the jury foreperson approached the Court with a question during the jurors' deliberations:

The Court:     Will the foreperson please stand, juror number 3, I believe. There is a question that you have for the Court?

The Foreperson:     We were wondering if we could have a specific clarification for when you were outlining the charges, perjury, you gave four itemizations that would render us to a guilty verdict so we could have it all on paper.

And we're also wondering if we can look at the preliminary hearing that was so advised that we should do so to be fair and just.

The Court:     I will allow you to have a redacted copy of the notes from the preliminary hearing. The answer to that is yes.

The Foreperson:     Okay. I think really we just want clarification before we render any kind of a verdict. Do we have four points that have to be met to reach one of the verdicts that you – one of the charges that you read to us? I think we're a little –

The Court:     I will do this. I will read the charge to you again, unless counsel objects in some way or other.

[The Commonwealth]:     No, sir.

The Court:     I think that's appropriate.

[Defense Counsel]:     Can we see you at sidebar for a moment, Your Honor. Briefly.

The Court:     Surely.

(The following occurred at sidebar out of the hearing of the jury:

27

[Defense Counsel]: Your Honor, respectfully, I think we have to respond to the question. And the question is simply do all four elements have to be met in order to – beyond a reasonable doubt in order to find the person guilty. I don't think they're asking for a recharge.

The Court: But I know within the charge it says in order to find the person guilty of, you must find –

[Defense Counsel]: I think it's a yes or no answer. And that's all I'm suggesting to the Court, as a direct response to the question under the rules. But –

The Court: I would rather read it to them. Then there's no ambiguity.)

---

The Court: The defendant has been charged with perjury. To find the Defendant guilty of this offense, you must find that each of the following elements have been proven beyond a reasonable doubt:

First, that the Defendant made a false statement;

Second, that the false statement was made under oath;

Third, that the false statement was made during an official proceeding. I instructed you that the statement was made at a preliminary hearing; so, therefore, it was made at a trial and was an official proceeding.

Fourth, that the Defendant knew that his statement was false at the time it was made;

And fifth, that the false statement was material to the proceedings during which it was made.

The charge sheet has been prepared for each of you, and you will receive such as you leave the room now.

Very well. The jury may retire now.

The Court: Let me meet with counsel at sidebar.

---

(The following occurred at sidebar out of the hearing of the jury:

The Court: I think the high road gives us the best road here. That is to say, we read it entirely, didn't add any editorialization, and gave them the same thing we gave them the first time. So there was nothing that would create any ambiguity. It was clarification, and they now know because I read the words which clearly speak for themselves. ... )

N.T. June 29, 2012, pp. 655-658.

The Superior Court of Pennsylvania has stated that:

When reviewing claims that the trial court erred in instructing the jury:

28

our scope of review is to determine whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case. *Williams v. Philadelphia Transportation Company*, 415 Pa. 370, 384, 203 A.2d 665, 667 (1964). Error in a charge is sufficient ground for a new trial, if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. *Gilder [Glider] v. Com. Dept. of Hwys.*, 435 Pa. 140, 151-52, 255 A.2d 542, 547 (1969). A charge will be found adequate unless "the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said." *Voitasefski v. Pittsburgh Rys. Co.*, 363 Pa. 220, 226, 69 A.2d 370, 373 (1949). A reviewing court will not grant a new trial on the ground of inadequacy of the charge unless there is a prejudicial omission of something basic or fundamental. *Sweeney [Sweeny] v. Bonafiglia*, 403 Pa. 217, 221, 169 A.2d 292, 293 (1961); *Giorgianni v. DiSanzo*, 392 Pa. 350, 356, 140 A.2d 802, 805 (1958). In reviewing a trial court's charge to the jury, we must not take the challenged words or passage out of context of the whole of the charge, but must look to the charge in its entirety. *McCay v. Philadelphia Electric Company*, 447 Pa. 490, 499, 291 A.2d 759, 763 (1972).

*Stewart v. Motts*, 539 Pa. 596, 606, 654 A.2d 535, 540 (1995). A trial judge has wide latitude in his/her choice of language when charging the jury, provided that the judge fully and adequately conveys the applicable law. *Wagner v. Anzon*, 453 Pa.Super. 619, 632-34, 684 A.2d 570, 577 (1996), *alloc. denied*, 549 Pa. 704, 700 A.2d 443 (1997).

*Jeter v. Owens-Corning Fiberglas Corp*, 716 A.2d 633, 635 (Pa.Super. 1998).

In addition, the Superior Court had explained earlier that:

" 'The primary duty of a trial judge in charging a jury is to clarify the issues so that the jury may comprehend the questions they are to decide.... If the charge is wholly inadequate or not clear, or has a tendency to mislead and confuse rather than to clarify the issues, a new trial will be granted.... The functions of a trial judge embrace not only the duty to state to the jury correct principles of law applicable to the pending case and to endeavor to make such principles understandable in plain language, but they also impose upon the judge the duty to assist the jury in applying those principles to the issues presented to them for determination.' " *McEwan v. Yellow Cab Co.*, 182 Pa.Super. 219, 224, 126 A.2d 816, 819 (1956), quoting *Archer v. Pennsylvania Railroad Co.*, 166 Pa.Super. 538, 541, 72 A.2d 609, 611 (1950) (citations omitted). In determining whether error has been committed, however, the charge must be read in its entirety. See: *Riddle Memorial Hospital v. Dohan*, 504 Pa. 571, 576, 475 A.2d 1314, 1316 (1984); *Wilkerson v. Allied Van Lines, Inc.*, 360 Pa.Super. 523, 536, 521 A.2d 25, 32 (1987). To constitute reversible error, a jury instruction must be shown not

29

only to have been erroneous but also harmful to the party complaining. *Anderson v. Hughes*, 417 Pa. 87, 92, 208 A.2d 789, 791 (1965); *Mickey v. Ayers*, 336 Pa.Super. 512, 514-515, 485 A.2d 1199, 1201 (1984). A trial court is not required to accept the precise language of points for charge submitted by counsel so long as the issues are defined accurately and the applicable law is correctly reviewed. See. *Geyer v. Steinbronn*, 351 Pa.Super. 536, 554, 506 A.2d 901, 911 (1986); *Fish v. Gosnell, supra* 316 Pa.Super. at 580, 463 A.2d at 1050.

*Spearing v. Starcher*, 532 A.2d 36, 40 (Pa.Super. 1987).

In applying the principles enunciated in *Jeter* and *Spearing, supra*, it is clear that Browndorf's allegation concerning this Court's alleged error in re-reading to the jury the complete instruction, rather than just responding with a "yes" or "no" answer, is meritless.

In this particular instance, the jury questioned whether "four points [had] to be met to reach one of the verdicts [for] one of the charges that [was] read to [them]." The complete instruction for the charge of perjury indicates that there are five elements, not four, that are necessary for a finding of guilty to the charge of perjury: a false statement, knowingly made by the defendant, under oath, during an official proceeding, which was material to the official proceedings at which it was made. The question addressed to this Court by the jury foreperson therefore indicated that some confusion or perhaps misunderstanding existed within the minds of the jurors concerning the actual charge for perjury which might not be remediated by a simple "yes" or "no" answer. Consequently, we concluded that, with an abundance of caution, it would be most effective and practicable to re-read the entire instruction to the jury, with the knowledge that the plain language of the instruction clearly contained the answer to the jurors' question, which was: "you must find that each of the following elements have been proven beyond a reasonable doubt."

By re-reading to the jury the instruction on perjury in its entirety, we insured that there was no "prejudicial omission of something basic or fundamental," and we avoided any

30

possibility that the charge as a whole would be "inadequate or not clear" or that a partial recital of the instruction or explanation would have "a tendency to mislead or confuse rather than clarify a material issue." The recital of the instruction in its entirety was certainly not erroneous, and Browndorf has not indicated how he was impermissibly prejudiced by this approach. Although we presume that Browndorf's defense counsel probably reasoned that any misunderstanding or confusion on the part of the jurors when deliberating would necessarily weigh in his client's favor by increasing the specter of reasonable doubt, and that is why he was insistent upon this Court providing a simple "yes" or "no" answer, that is not proper or sufficient grounds for this Court to overlook what we perceived to be a situation in which we believed the jury may have misunderstood or misinterpreted the law. Consequently, we concluded that a recital to the jury of the complete instruction would reinforce the proper and necessary legal concepts and assist them in arriving at a fair and just verdict, and we again reject Browndorf's complaint.

For the foregoing reasons, we recommend that this appeal be denied.

BY THE COURT:

DATE: July 21, 2014

JOHN L. BRAXTON, J.

31